******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE ALIZABETH L.-T. ET AL.*
(AC 44814)

Bright, C. J., and Prescott and Flynn, Js.

*Syllabus*

Pursuant to statute (§ 46b-129 (g)), at a contested hearing on an order for temporary custody, "credible hearsay evidence regarding statements of the child or youth made to a mandated reporter . . . may be offered by the parties and admitted by the court upon a finding that the statement is reliable and trustworthy and that admission of such statement is reasonably necessary."

The respondent father appealed from the judgments of the trial court sustaining the ex parte orders granting temporary custody of his three minor children to the petitioner, the Commissioner of Children and Families. Following the receipt of an anonymous report that the children were the victims of physical and sexual abuse and possible sexual exploitation, the petitioner filed neglect petitions on their behalf, as well as motions seeking ex parte orders of temporary custody. The trial court granted the ex parte orders of temporary custody and, after the children were removed from the family home, held a contested hearing on the motions. At that hearing, the petitioner offered testimony from Z, the children's adult sister-in-law, and B, a social worker for the Department of Children and Families. Z testified, inter alia, that she was a mandated reporter, and the court allowed her to testify, pursuant to § 46b-129 (g), as to certain discussions she had with the children in which they disclosed that they were physically and sexually abused by the respondent mother and her boyfriends. B also testified with respect to discussions she had with the children, in which they disclosed to her instances of abuse, and a forensic interview that she conducted with one of the children, A. The court also admitted certain exhibits, over the hearsay objections of the father's counsel, including a copy of B's affidavit, which had accompanied the petitioner's filings and contained the children's hearsay statements, photographs of cell phone screenshots showing text messages between the children and Z, and a copy of a text message from Z to B that memorialized a conversation that Z had with A. On the respondent father's appeal, *held*:

1. The trial court improperly admitted hearsay statements of the minor children under § 46b-129 (g) because, before the court could rely on that statutory exception to the hearsay rule to admit the challenged statements, the petitioner had the burden of establishing some reasonably necessary basis as to why the children should not be required to testify at the contested hearing:

   a. Because the term "reasonably necessary," as used in § 46b-129 (g), was ambiguous, this court reviewed extratextual evidence, and especially the legislative history of the statute, to conclude that a trial court is not required to find that children declarants are unavailable to testify as a prerequisite to admitting hearsay statements they made to a mandated reporter but, instead, is required to consider a number of factors in light of the specific circumstances of the case before it, including the age of the child involved, the materiality of the offered hearsay statement, the likelihood of prejudice to the respondent parent due to the inability to cross-examine the child regarding the hearsay statement, any difficulties in obtaining the in-person testimony of the child, and whether in-court testimony could result in emotional or mental harm to the child; moreover, considering those factors will require trial courts to weigh various interests, namely, the state's interest in conducting hearings on orders of temporary custody in a timely and efficient manner, protecting the procedural rights of the respondent parents to challenge the evidence presented by the petitioner, and ensuring that the children who are the subject of the proceeding are protected from unnecessary psychological harm.

   b. The trial court abused its discretion in admitting the testimony of Z and B, each of whom recounted various out-of-court statements made by the children: the court made no finding that the children would have

suffered psychological harm from testifying or that there was any other reasonable basis for the petitioner not to have presented the in-court testimony of the children, and, although the petitioner's counsel argued that testifying likely would be difficult and potentially harmful to the children, the court was not free to accept that representation without supporting evidence given that counsel for the respondent father contested it, arguing the children were teenagers who easily could be brought to court to testify; moreover, at the contested hearing, the petitioner's counsel focused on the reliability of the statements, apparently believing that that was sufficient, the allegations of physical and sexual abuse all involved the mother or her boyfriends, there was little chance of the children being confronted by her at the hearing, and the court offered no analysis supporting its conclusion that the admission of the hearsay statements was reasonably necessary.

c. The trial court improperly admitted certain exhibits that contained inadmissible hearsay statements or that were authenticated by way of hearsay statements of the children: the exhibits containing the cell phone screenshots showing messages between the children and Z and a text message from Z to B that memorialized a conversation that Z had with A were inadmissible for the same reasons that the hearsay statements of the children offered through the testimony of Z and B were improperly admitted by the court pursuant to § 46b-129 (g); moreover, certain photographs that were offered by the petitioner as corroborating evidence of the alleged physical abuse inflicted on the children by the mother were improperly admitted through Z, who did not have the necessary personal knowledge to authenticate the photographs but, rather, relied entirely on the children's inadmissible hearsay statements in attempting to do so.

d. The court improperly admitted into evidence the affidavit of B, which was filed in support of the neglect petitions and motions for orders of temporary custody: although such an affidavit generally is admissible under the affidavit provision of § 46b-129 (g), B's affidavit was inadmissible to the extent that it contained the children's inadmissible hearsay statements in light of the general prohibition on hearsay within hearsay.

2. The trial court improperly admitted hearsay statements made by A to B during the forensic interview on the alternative ground that they fell under the medical diagnosis or treatment exception to the hearsay rule:

a. The respondent father properly preserved his claim regarding the medical treatment exception: part and parcel of the objection made by the respondent father's counsel to the admission of A's statements was that there was no evidence that any medical treatment occurred as a result of the forensic interview, and counsel's arguments were sufficient to put the court on notice to consider whether all necessary requirements under the medical treatment exception had been satisfied, including whether the petitioner had demonstrated that A understood her statements to have been made in furtherance of medical treatment.

b. The court was not presented with any evidence from which it reasonably could have inferred that A understood the forensic interview to have a medical purpose: the record suggested that the children understood the interview to be for investigatory purposes, as they elected to have only A interviewed by B in order to limit the risk of angering their parents if they were implicated in wrongdoing, thus indicating that A understood the purpose of the forensic interview to be to further the investigation against the parents; moreover, the record was silent as to whether A understood the interview to potentially involve a medical treatment component, and no medical examination or interview with a medical professional occurred in conjunction with the forensic interview conducted by B from which such an understanding might have been inferred.

3. The trial court's evidentiary errors were harmful and, accordingly, this court reversed the judgments of the trial court and remanded the case for a new contested hearing on the ex parte orders of temporary custody: outside of the evidence that this court determined to be inadmissible, there was nothing in the record from which the court reasonably could have found that the children presently were in danger of a serious physical injury or illness, or that they were in immediate physical danger from their surroundings, as all of the evidence of abuse implicated the mother, who was living in Puerto Rico, and, although there was testimony that the father intended to have the mother return to the residence, there was no evidence that her return was imminent; accordingly, without the improperly admitted hearsay testimony and exhibits, it was likely that the outcome of the hearing would have been different.

Argued January 31—officially released June 29, 2022**

*Procedural History*

Petitions by the Commissioner of Children and Families to adjudicate the respondents' minor children neglected, brought to the Superior Court in the judicial district of Windham, Juvenile Matters, where the court, *Carbonneau, J.*, issued ex parte orders granting temporary custody of the children to the petitioner; thereafter, the court, *Chaplin, J.*, sustained the orders of temporary custody, and the respondent father appealed to this court. *Reversed*; *further proceedings*.

*Robert M. Fitzgerald*, for the appellant (respondent father).

*Andrei Tarutin*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee (petitioner).

*Sharon A. Peters*, for the minor children.

*Opinion*

PRESCOTT, J. The respondent father, Benjamin L.,[1] appeals from the judgments of the trial court sustaining ex parte orders granting temporary custody of his minor children, Alizabeth L.-T., Tanisha L., and Alyson L.-T.,[2] to the petitioner, the Commissioner of Children and Families. The respondent father raises several evidentiary claims on appeal, including that, at the contested hearing, the court improperly (1) admitted certain hearsay statements of the children under a statutory exception to the hearsay rule codified in General Statutes § 46b-129 (g),[3] and (2) admitted hearsay statements made by Alizabeth during a forensic interview under the medical diagnosis or treatment exception to the hearsay rule.[4] See Conn. Code Evid. § 8-3 (5). We agree with both claims and conclude that these evidentiary errors, considered together, were not harmless because, without the improperly admitted hearsay testimony and exhibits, it is likely that the outcome of the hearing would have been different. Accordingly, we reverse the judgments of the court and remand the case for a new contested hearing.

The record reveals the following procedural history. On May 13, 2021, the Department of Children and Families (department) received an anonymous report regarding allegations that Alizabeth, Tanisha, and Alyson were the victims of physical and sexual abuse as well as possible sexual exploitation. Specifically, the report alleged that the respondent mother had permitted boyfriends with whom she was having extramarital affairs to sexually assault the children and had directed Alyson and Tanisha to lose weight so that she could sell photographs of them. The report also alleged physical abuse of the children by the respondent mother, and that the respondent father was aware of the alleged abuses by the respondent mother but had instructed the children to lie if they were questioned by the department or law enforcement about the abuse. On May 21, 2021, following an investigation by the department into the allegations, the petitioner filed neglect petitions on behalf of the children and motions seeking ex parte orders of temporary custody. An affidavit by a department social worker, Kristy Borders, in which she detailed the various allegations and preliminary investigatory findings of the department, was attached to the petitioner's filings. The court, *Carbonneau, J.*, granted the ex parte orders of temporary custody that same day and set a preliminary hearing date for May 25, 2021.

The petitioner, on obtaining the ex parte orders, immediately removed the children from the respondent parents' home and placed them in the temporary care of the children's older brother, Jamie C., and his wife, Zesmery F. Zesmery works at an area hospital and is a mandated reporter;[5] see General Statutes § 17a-101 (b); and she was the person who had alerted the depart-

ment of the suspected abuse and neglect.

At the May 25, 2021 preliminary hearing, the respondent father appeared and indicated that he intended to contest the orders of temporary custody.[6] The respondent father waived his right to a hearing within ten days; see General Statutes § 46b-129 (c) (4); and the court, *Chaplin, J.*, set a contested hearing date for June 17, 2021.

At the contested hearing, the petitioner offered testimony from Zesmery and Borders, and five exhibits, all of which were admitted in full by the court over the objections of the respondent father's counsel. Exhibit A was a copy of Borders' affidavit that had accompanied the neglect petitions. Exhibit B consisted of photographs of cell phone screenshots showing text messages exchanged between Zesmery and Tanisha. Exhibit C was a photograph purporting to show an injury to Alizabeth's ear. Exhibit D was a photograph of damage to a door purportedly caused when the respondent mother pushed one of the children into it. Exhibit E was a copy of a text message from Zesmery to Borders memorializing a conversation that Zesmery had with Alyson. The respondent father testified on his own behalf but offered no exhibits of his own. As previously noted, the respondent mother did not appear for the contested hearing. The children were represented at the hearing by appointed counsel.

Following the presentation of the evidence and closing arguments, the court rendered a brief oral ruling from the bench sustaining the ex parte orders of temporary custody. The court stated that the allegations of both sexual and physical abuse of the children were "very, very concerning"; the court, however, did not initially delineate who committed the sexual and physical abuse. It also noted the existence of additional allegations that the respondent parents had coached the children to lie to the department during its initial investigation. Finally, the court stated that "[t]here's also concerns whether or not there is any accuracy as to the reported nature of the composition of the home currently, whether [the respondent mother] intends to return, has the capacity to return, and whether or not there has been sufficient attention shown to the care of the girls, their condition, and the allegations that they've provided . . . ." In summary fashion, the court then concluded: "Based upon all the information provided to the court, the evidence that's been before the court, the court does find that there has been sufficient credible evidence presented to the court to demonstrate that there was immediate physical danger; therefore, the court does find that the reason for commitment or at least the order of temporary custody existed at the time and has yet been rectified. Continuation . . . in the home, or returning to the home, is not in the best interest of the children, it is contrary to their welfare,

and it is in the best interest of the children that the [orders of temporary custody] be sustained." The respondent father timely filed the present appeal.

Following the filing of the appeal, both the petitioner and the respondent father filed motions for articulation asking the trial court to set forth the factual basis for its decision. The trial court granted these motions and filed a written articulation in which it set forth the following factual findings: "Tanisha is the biological child of the respondent parents. Alizabeth and Alyson were placed with the respondent parents by the petitioner in July, 2016, and subsequently [were] adopted by the respondent parents in May, 2019. . . . Jamie and Zesmery are the current foster parents of the children. Zesmery has developed a close relationship with the children over the last year approximately. Zesmery communicates with the children almost daily on social media . . . and they visit in person as well. In early May, 2021, the children were left home alone while the respondent father traveled to Puerto Rico to address marital issues with the respondent mother, who was residing [there] at a home owned by the respondent parents. Specifically, he wanted to discuss the respondent mother's infidelity. Zesmery and Jamie brought the children to stay at their home while the respondent father was in Puerto Rico. During [that] time . . . [the children] disclosed incidents of *sexual abuse and exploitation by the respondent mother*.[7] Jamie called the respondent father by cell phone to relay the disclosures, and the respondent father directed Jamie not to worry and that he would take care of these concerns.

"The respondent father returned from Puerto Rico the next day and the children returned home. The respondent father informed the children that the respondent mother remained in Puerto Rico and that he would bring her back to their home in [Connecticut]. The respondent father instructed the children . . . to lie to the petitioner. The children informed Zesmery that they were afraid of the respondent mother returning home to Connecticut. Alyson called Zesmery crying and relayed that the respondent parents told her to lie to the petitioner, to recant all of the disclosures, and to tell the petitioner that living with Jamie was unsafe.

"Alizabeth and Alyson disclosed incidents of physical abuse by the respondent mother and provided pictures related to these incidents. They believed such incidents occurred because they [had] told the respondent father of the respondent mother's infidelity with other men. The respondent mother pushed Alyson into a door with such force that the door was damaged. The respondent father was present for this incident and pulled the respondent mother away to stop her from inflicting further physical abuse. In the days after the disclosure to Zesmery, but immediately prior to the petitioner's

home visit, the respondent father replaced the damaged door. During the course of the petitioner's removal of the children from the home, the respondent father pulled the children into the bathroom and told them to lie to the petitioner and to recant all of their disclosures.

"After the children were removed from the home, the respondent father called Tanisha and told her to call the respondent mother. Tanisha called the respondent mother. During this call, the respondent mother told Tanisha to protect [her], to prioritize [her] over Alizabeth and Jamie, and to lie to the petitioner. The children disclosed to Zesmery and . . . Borders that they are fearful of returning home out of fear of the respondent parents." (Emphasis added; footnote added.)

The court also found that "the children ha[d] disclosed these incidents of sexual abuse and exploitation [by the respondent mother] to the respondent father in April, 2021, prior to their disclosure to Zesmery and Jamie" and that the "respondent father failed to take any appropriate action to protect the children from the respondent mother." The court finally indicated that it did not credit the respondent father's testimony at the contested hearing that "he told the respondent mother not to return [from Puerto Rico] to the family home in [Connecticut]." Additional facts and procedural history will be set forth as necessary.

Before turning to the respondent father's claims of error, we first set forth some overarching legal principles and discuss our standard of review. Section 46b-129 governs petitions to adjudicate a child neglected, uncared for, or abused. This court previously has explained that subsection (b) of § 46b-129 authorizes courts to issue "an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody if it appears, on the basis of the petition and supporting affidavits, that there is reasonable cause to believe that (1) the child or youth is suffering from serious physical illness or serious physical injury or *is in immediate physical danger from the child's or youth's surroundings*, and (2) that as a result of said conditions, the child's or youth's safety is endangered and *immediate removal from such surroundings is necessary* to ensure the child's or youth's safety . . . ." (Emphasis added; internal quotation marks omitted.) *In re Kelsey M.*, 120 Conn. App. 537, 542, 992 A.2d 372 (2010).

"A preliminary hearing on any ex parte custody order . . . issued by the court shall be held not later than ten days after the issuance of such order. . . ." General Statutes § 46b-129 (b). "Connecticut law is clear that, in the context of a hearing for an order of temporary custody pursuant to § 46b-129 (b), a finding of immediate physical danger is a prerequisite to the court's entry of a temporary order vesting custody of a child in one other than the child's parents." (Internal quotation

marks omitted.) *In re J.R.*, 161 Conn. App. 563, 573, 127 A.3d 1155 (2015).

Following the preliminary hearing on an ex parte order of temporary custody, "[u]pon request, or upon its own motion, the court shall schedule a hearing on the order for temporary custody . . . to be held not later than ten days after the date of the preliminary hearing." General Statutes § 46b-129 (f). "The proper standard of proof in a [contested hearing] on an order of temporary custody is the normal civil standard of a fair preponderance of the evidence." (Internal quotation marks omitted.) *In re J.R.*, supra, 161 Conn. App. 571; see also Practice Book § 32a-3.

In an appeal taken from a trial court's decision to sustain an ex parte order of temporary custody, the applicable standard of review depends on the nature of the claim raised. "[A]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's [factual] findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Kelsey M.*, supra, 120 Conn. App. 543.

"Our standard of review regarding [most] challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing . . . of substantial prejudice or injustice. . . . Additionally, it is well settled that even if the evidence was improperly admitted, the [party challenging the ruling] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *In re Tayler F.*, 111 Conn. App. 28, 35, 958 A.2d 170 (2008), aff'd, 296 Conn. 524, 995 A.2d 611 (2010).

Finally, to the extent that a claim of error presents a question of law, such as the proper interpretation of a statute or a provision of the Connecticut Code of Evidence, our review is plenary. See, e.g., *In re Adrian K.*, 191 Conn. App. 397, 403–404, 215 A.3d 1271 (2019); see also *In re Tayler F.*, 296 Conn. 524, 537, 995 A.2d 611 (2010). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the

text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . Importantly, ambiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation. . . . In other words, statutory language does not become ambiguous merely because the parties contend for different meanings." (Citations omitted; internal quotation marks omitted.) *In re Elianah T.-T.*, 326 Conn. 614, 620–21, 165 A.3d 1236 (2017). With these principles in mind, we turn to the claims on appeal.

I

The respondent father first claims that the court improperly admitted out-of-court statements of the children into evidence at the contested hearing pursuant to a hearsay exception set forth in § 46b-129 (g). He identifies the challenged evidence as falling into four categories: (1) testimony by Zesmery and Borders regarding statements made to them by the children; (2) statements of the children set forth in Borders' affidavit, which was admitted as a full exhibit; (3) statements made by Alizabeth to Borders during a forensic interview;[8] and (4) four other exhibits that, according to the respondent father, either contained inadmissible hearsay statements or improperly "were authenticated by way of hearsay statements of the children." According to the respondent father, the court failed to interpret properly the terms "reasonably necessary" and "reliable and trustworthy" as used in § 46b-129 (g), in a manner consistent with prior appellate court interpretations of nearly identical terms found in the residual, or catchall, exception to the hearsay rule. See Conn. Code Evid. § 8-9.[9] With respect to the "reasonably necessary" requirement in particular, he argues that a proper construction of the statutory hearsay exception should have required the petitioner to establish that the children were "unavailable" to testify at the contested hearing before the court properly could admit their hearsay statements, which the petitioner failed to do. See General Statutes § 46b-129 (g); see also *In re Tayler F.*, supra, 296 Conn. 537.

The petitioner contends, inter alia, that the respondent father's interpretation of § 46b-129 (g) to require the unavailability of the declarant, is not supported by the language of the statute or the statute's legislative history. Furthermore, she contends that interpreting § 46b-129 (g) simply to adopt and incorporate the

requirements of the residual hearsay exception, which already existed as a basis for the admission of hearsay at a contested hearing on an ex parte order of temporary custody, would effectively render the statutory language superfluous and, thus, violate a cardinal principle of statutory construction. See, e.g., *In re Jusstice W.*, 308 Conn. 652, 662 n.9, 65 A.3d 487 (2012). For the reasons that follow, we agree with the petitioner that the statute cannot reasonably be construed as merely codifying, in a more limited context, the residual hearsay exception as it existed under our common law at the time the legislature enacted § 46b-129. We nonetheless also agree with the respondent father that we must give effect to the legislature's choice to incorporate the term "reasonably necessary" into the statutory hearsay exception. We therefore conclude, under these circumstances and particularly in light of the advanced ages of the children involved in the present case,[10] that, before the court could rely on the statutory hearsay exception to admit the challenged statements, the petitioner had the burden of establishing some "reasonably necessary" basis why the children should not be required to testify at the contested hearing.

## A

We first set forth the following additional facts and procedural history, which are relevant to our resolution of this claim. At the contested hearing, the petitioner's counsel first called Zesmery to testify. After answering a series of questions that established that Zesmery was a mandated reporter, the petitioner's counsel asked her how she became involved in the present case. She responded that the children had confided certain information to her. When the petitioner's counsel asked what they had confided to her, the respondent father's counsel objected on hearsay grounds.

In response to that objection, the petitioner's counsel argued that, because Zesmery was a mandated reporter, any credible hearsay statements made to her by the children were admissible for purposes of the contested hearing pursuant to § 46b-129 (g). See footnote 3 of this opinion. The respondent father's counsel responded that the petitioner had yet to establish, however, that the children's statements were "reliable [and] trustworthy" and "reasonably necessary," both of which are required under § 46b-129 (g) and, according to the respondent father's counsel, was language that the legislature intended to "track the pre-[Connecticut Code of Evidence] and code understanding of the residual hearsay exception." The respondent father's counsel also argued that our Supreme Court's holding in *In re Tayler F.*, supra, 296 Conn. 524, was instructive with regard to the meaning of both terms and that the court in *In re Tayler F.* had held, in his words, that "it's not enough to have a generalized idea [that] the children shouldn't be able to testify, nor is it even enough that it be in the

best interest of the children." The respondent father's counsel contended that the court was required to make a specific determination that the children would sustain psychological harm if they appeared in court before it could admit into evidence the children's statements in their absence.[11]

The petitioner's counsel disagreed with the characterization by the respondent father's counsel of the court's holding in *In re Tayler F.* He first explained that *In re Tayler F.* involved an appeal taken from the adjudication of a neglect petition, not an appeal from an order sustaining an ex parte order of temporary custody. Next, he argued that the court in *In re Taylor F.* specifically addressed the requirements needed to satisfy the residual exception to the rule against hearsay and not the statutory exception on which the petitioner relied in the present case, which, by its terms, does not apply in a trial on a neglect petition.[12] Although the petitioner's counsel agreed with the respondent father's counsel that, in order to admit hearsay statements pursuant to the statutory exception, the court must first conclude that the proffered statements were reliable and trustworthy and that their admission was reasonably necessary, he disagreed that the court also had to conclude that the children would be harmed psychologically if they were required to testify or that they were otherwise legally unavailable to testify.[13]

The court, at first, sustained the objection of the respondent father's counsel but only to the extent that it agreed with him that more foundation was necessary regarding the reliability and trustworthiness prong. The court otherwise overruled the objection. The petitioner's counsel indicated he was "[h]appy to do that" and continued with his examination of Zesmery.

The petitioner's counsel, through the witness' answers to the additional questions, elicited that Zesmery, as the children's sister-in-law, had known the children for several years and had a very close relationship with them. In the past, she had visited them at their home and they would visit and stay overnight with her and Jamie at their apartment. They always shared with her what was happening in their lives, whether about friends or school. The children and Zesmery had become particularly close over the past year and communicated with one another almost daily via social media. To her knowledge, the children never had lied to her or provided her with inaccurate information.

The petitioner's counsel next asked Zesmery to explain the circumstances that led her to file her report with the department alleging abuse and/or neglect of the children. She explained that the children had come to stay overnight with her and Jamie at their apartment while the respondent father was in Puerto Rico because Jamie did not feel comfortable having the children stay at the respondent parents' home unsupervised. They

were having dinner together when the conversation turned to the children's disclosures.

At this point in Zesmery's testimony, the petitioner's counsel indicated to the court that he believed he had established that the children's disclosures to Zesmery were sufficiently reliable and trustworthy. In particular, he argued that the children's statements were reliable and trustworthy on the basis of Zesmery's testimony that she had known the children for years, she never had any reason to question their veracity, and the statements were made around the dinner table under ordinary circumstances in which the children were staying with them overnight.

With respect to the "reasonably necessary" requirement, the petitioner's counsel argued, without evidentiary support, that because the subject matter of the disclosure involved allegations of sexual abuse, "to put them on the stand . . . would . . . without a question, would be harmful to them. And that alone makes the admission of these statements reasonably necessary." The petitioner's counsel also seemed to rely on the mere relevancy of the statements to the issue before the court, stating that admitting the statements would be necessary to "allow the court to get the perspective and the necessary background information to explain what unfolded once the statements had been made."

The attorney for the minor child agreed with the petitioner's counsel that he had met his burden of establishing the admissibility of the children's hearsay statements under § 46b-129 (g). The attorney for the minor child also suggested that, in deciding whether to admit the children's hearsay statements, the court should consider Practice Book § 32a-4, which requires any party intending to call a child as a witness to file a motion seeking the permission of the court. See Practice Book § 32a-4 (b).[14] She suggested that the court reasonably could assume that the children effectively were unavailable to testify, at least in part, because neither side had filed such a motion.

The respondent father's counsel argued, with regard to Practice Book § 32a-4, that this rule should weigh in his favor, stating: "[T]he department could have filed a motion to the court that they intended to call the girls to testify. And . . . had the court held a hearing, conducted the inquiry that's required, and ruled that they couldn't call them, then they might have a better argument that it was reasonably necessary [to admit the statements, absent the children's appearance in court]. They chose not to do that; it wasn't my job to."

The respondent father's counsel then focused on whether the admission of the hearsay statements was reasonably necessary, making no arguments at that time challenging whether the statements were trustworthy and reliable. With respect to the "reasonably necessary"

prong, he argued: "The department may think this is necessary in order to prove the allegations in its . . . petition, but that's not what reasonably necessary involves. Reasonably necessary has to do [with] whether . . . there's no other way of getting this evidence in. These are not small children, you know, these are not five year olds, six year olds, eight year olds. A sixteen year old, [a] fifteen year old, and a thirteen year old—you know, when we look at the tender [years] section of . . . the [Connecticut] Code of Evidence—there's a criminal statute—the number of which is escaping me—that has to do with children, and that's under twelve as well.[15] I think that our code of evidence and our statutes, you know, kind of assume . . . that older children and youths are able to testify. It's their obligation under . . . *In re Tayler F.* is the best case we have, and I know that . . . it's about the residual exception, but buried—the language is exactly the same.

"My client has a right to cross-examine the witnesses. All I can do now, if you admit this, is cross-examine someone who's gonna tell me about what someone else said. Cross-examin[ation] is the greatest engine of truth ever invented, I believe Wigmore said, and . . . I claim it here along, of course, with his statutory rights to cross-examination and confrontation and to due process. I express . . . they haven't laid any foundation that allows you to admit this testimony." (Footnote added.)

The court then made the following ruling: "[B]ased upon that foundation provided by the witness regarding the relationship with the children, the nature of that relationship, the duration of that relationship, and the level of what you could call intimacy of that relationship, the court will . . . make requisite findings that the statement will be reliable and trustworthy and that admission of it is reasonably necessary, so the statement is permitted." The comments by the court seem to bear on only the question of the trustworthiness of the statements and not whether it was reasonably necessary to admit them.

The respondent father's counsel indicated to the court that he likely would have the same objection to many other questions going forward, to the extent that they sought to elicit from the witness the content of additional statements made to her by the children. He asked the court: "If I was to say 'same objection' on each one and the court was to understand that it's hearsay, it doesn't meet the statute, that it's cross-examination, confrontation, and his due process, would we be all agreeing?" The court answered affirmatively. The respondent father's counsel indicated that he would let the court know if he had any additional or different grounds for an objection.

Zesmery then testified that the children had indicated

to her during dinner that they were afraid that the respondent father would be bringing the respondent mother back with him when he returned from Puerto Rico. When Zesmery asked them why they were afraid, Alizabeth responded that one of the respondent mother's boyfriends had "molested [her and Tanisha] while they were in Puerto Rico," and that she, Alizabeth, "was made to have sex with one of [the respondent mother's] boyfriends . . . ." Tanisha told Zesmery that the respondent mother had told her and Alyson that they needed to lose weight because they were "too big" and the respondent mother "wanted to sell pictures of them online." In response to their disclosures, Zesmery told the girls that she may have to contact the department.

Zesmery further testified that Jamie called the respondent father that same night about the children's allegations, and also spoke with him in person after the respondent father returned from Puerto Rico the following day. According to Zesmery, she waited one week before reporting the allegations to the department because the respondent father had indicated to Jamie that "he would take care of it" but that he never did. Zesmery further stated that the "[respondent mother] was still in Puerto Rico, and [the respondent father] was telling the kids that he was going to bring her home." Zesmery testified that the children told her that the respondent father had instructed them not to disclose anything to the department. She eventually contacted the department about the allegations.

During her testimony, Zesmery also recounted that, on the day the children were removed from the respondent parents' care pursuant to the ex parte orders of temporary custody, Alyson called her crying. Alyson told Zesmery that the respondent parents had instructed the children to lie to the department and to tell the department that the allegations of abuse against the respondent parents were untrue and that it was unsafe for them to live with Jamie. The respondent father's counsel renewed his hearsay objection to that testimony, which the court overruled. Zesmery also testified that she sent a text message to Borders that memorialized what Alyson had told her. The petitioner's counsel then sought to admit into evidence exhibit E, which was a copy of the text message that Zesmery had sent to Borders. The respondent father's counsel objected, arguing that the exhibit was cumulative of Zesmery's testimony of what Alyson had told her and inadmissible as a prior consistent statement offered to bolster or corroborate Zesmery's testimony. See Conn. Code Evid. § 6-11. The court overruled the objections, indicating that it would "give it the appropriate weight it deserves."

The petitioner's counsel next elicited testimony from Zesmery that, prior to contacting the department, she had exchanged messages on Snapchat with Tanisha and Alizabeth that she had decided to screenshot and save

to her phone.[16] The petitioner's counsel then sought to admit into evidence exhibit B, which consisted of three photographs of cell phone screenshots showing portions of those messages, which the petitioner's counsel claimed showed the emotional state of the children prior to their removal. Zesmery testified that the photographs were of the saved Snapchat conversations, and that she knew that these messages were coming from the children because they had exchanged numerous messages in the past, their usernames were shown, and she was familiar with their writing style. The respondent father's counsel objected to the admission of the exhibit on hearsay grounds and on the ground that its admission would be more prejudicial than probative, given that it depicted only a part of the Snapchat exchange and, because of the disappearing nature of Snapchat messages, he was prevented from putting the remainder of the exchange into evidence. The court overruled the objection. The exhibit was admitted in full.[17]

The petitioner's counsel then asked Zesmery if, before she contacted the department, the children had provided her with any evidence supporting their allegations of physical abuse. Zesmery responded that Alizabeth and Alyson had provided her with photographs. The petitioner's counsel then sought to introduce these photographs into evidence. With respect to exhibit C, Zesmery testified that Alizabeth had told her that the photograph showed an injury to her ear that happened after the respondent mother punched her prior to leaving for Puerto Rico. Alizabeth had explained that the respondent mother was angry because Alizabeth and Tanisha had disclosed her extramarital affairs to the respondent father. With respect to exhibit D, Zesmery testified that Alyson had told her that the photograph showed damage to a door that was caused when her mother pushed her into the door. The respondent father's counsel objected to the admission of these photographs on the ground that the only personal knowledge that Zesmery had regarding what was depicted in the photographs was obtained from the children's hearsay statements, and he renewed his prior objection to the admission of such statements. The court overruled the objection and admitted the photographs as full exhibits.

The petitioner's counsel next called Borders to testify. Borders testified that she spoke with the children during the investigation conducted by the department prior to the removal of the children. She also testified that she had a conversation with the children on the day she removed them from the respondent parents' home. When Borders started to recount what the children had said to her, the respondent father's counsel renewed his hearsay objection. In particular, he argued: "[E]ssentially, I have the same argument I had last time with . . . the prior witness. And, again, I come back to, you know, that it's not reasonable and necessary,

and it's not reliable and trustworthy. Your Honor made a finding I think last time if I'm not mistaken that the girls' relationship with . . . their . . . sister-in-law rendered the testimony somewhat reliable. I think the court, if you're gonna let this witness testify to what the girls said, it has to go through that same process, and I think [the petitioner] has to lay a foundation that this is reasonably necessary, reliable, and trustworthy."

The petitioner's counsel argued that he believed that he had laid the necessary foundation. With respect to the reasonably necessary prong, the petitioner's counsel stated that "the argument does not change; it's the same as it was for [Zesmery], Your Honor: It is reasonably necessary because we're dealing with kids and because the court should hear the entire story." With regard to whether the statements to Borders were reliable and trustworthy, the petitioner's counsel argued: "I have established that [Borders] is a mandated reporter. I have established that she was assigned to the case. I have established, Your Honor, that she's been trained in interviewing techniques. I have established the particular circumstances surrounding this particular conversation, and I believe that her testimony was that it was a long ride home, that the kids at first were standoffish, that they were listening to the music and not engaging, then they had to stop after a while, they had a meal, and the kids started warming up, and slowly but surely, they first voiced their—or, rather, questioned my client with regard to their concerns; 'What's gonna happen? Where are we going?'; and so on and so forth. And only after that, Your Honor, they also volunteered the statement that's being objected to, which was, you know, their unease with the possibility of being returned home."

In response, the respondent father's counsel argued: "Your Honor, again, it's not reasonably necessary because the girls were available within the subpoena power of the court. They're, you know, they're in the state of Connecticut. If the department wanted to tell the court what the girls had said, the department could've put them on the stand. The fact that . . . the witness is a mandated reporter brings it [under] the provision . . . of [§] 46b-129 (g). But that provision requires more than, you know, they . . . could've stopped and said, 'Anything that someone says to a mandated reporter comes into evidence.' It didn't stop there. It went on to say, 'as long as it's reasonably necessary and reliable and trustworthy.'

"Again, we go back to *In re Tayler F.*, which sets out the criteria by which we determine whether this kind of stuff is reasonable and necessary. And there has to be a particularized showing of psychological harm in order to allow this testimony. And they, as far as I know, have no—no such evidence. It's more than whether it would be in the best interest of the child. It

comes entirely down to whether they would actually be harmed by it. The court's entitled to every witness' testimony unless there's going to be some sort of harm.

"And, so, as a result, as I indicated before, it is—I would return—well, in addition, it's neither reliable nor trustworthy. The witness is an employee of the plaintiff in this lawsuit. She's their principal witness. She's made a determination, she has a vested interest in doing, you know, in—in pursuing it. She was interviewing them—they may not have known this, but she was interviewing them for the purpose of litigation.

"All those things I think would bode against admitting this—this type of testimony. So it's hearsay; it's a violation of my client's due process rights; it's a violation of his right to confrontation and cross-examination; and, on the basis of all those, I would submit . . . the department hasn't come close to establishing the necessary foundation to ask hearsay questions of this witness."

The court disagreed, stating, "based on what I've heard, the court will find that the department has made a sufficient foundation for this. The court will find it both reliable and trustworthy and reasonably necessary. And the court will admit the testimony."

Borders proceeded to testify that the children told her that they initially were hesitant to speak with her because the respondent parents had advised them "to keep their head down and not speak" to the department. They asked her what information they needed to tell her in order not to be returned home. According to Borders, when she asked them about what information they had already provided, they told her "that they had talked to their sister-in-law and that they had told her that they had been molested and touched by their mother's boyfriends, that they had told her that [the respondent mother] wanted the younger two girls to lose weight in order to take photographs," but that Alizabeth "was already pretty and skinny" and so "she was gonna go on PornHub . . . ." Borders testified that the children also disclosed physical abuse by the respondent mother of Alizabeth and Alyson. They further indicated to her that they had told the respondent father about the abuse. The children told Borders that, although the respondent father initially had said that "he was gonna take care of it," he also indicated that they "needed to protect their mother," and, thus, the children "were concerned that she was gonna come back to the home and they were gonna continue to be exposed to the things that they were exposed to."

Borders testified that she introduced the children "to the forensic interview process," that they were fearful, and that Tanisha and Alizabeth had said that "they wanted to tell me as little as possible that would meet the threshold for them not to go home because of the

chance that they ended up back home, what it would be like for them." Borders testified that the children told her that "their mother was never going to change and that their father wasn't going to change either" because he "was manipulated by their mother and had taken her side previously in disagreements within the household and that they believed he would take her side, she would return, and they would be in the same situation they were removed from."

Borders testified that after the children were placed with Jamie and Zesmery, she had another opportunity to speak with the children during a two day follow up visit. At that time, the children gave her additional information about the claimed abuse. Specifically, they provided her with "additional information as to the specific names of the boyfriends that ha[d] been involved in the sexual abuse. They provided more context to the information regarding the physical abuse. They provided more context to the information that [the respondent mother] wanted to take pictures and videos. They also provided me with locations . . . [at which the sexual and physical abuse] occurred." Borders also indicated that Tanisha had contact with the respondent parents after the removal and that Tanisha told her that they both had encouraged her to lie to the department and to recant her allegations. Throughout Borders' testimony, the respondent father's counsel reiterated his prior hearsay objection, which the court overruled.

The petitioner's counsel next asked Borders about a forensic interview that she conducted of Alizabeth on June 1, 2021. Borders testified that, during that interview, Alizabeth repeated the accusations that the children initially had made regarding physical and sexual abuse and also provided some new information. When asked by the petitioner's counsel what new information Alizabeth had provided, the respondent father's counsel renewed his hearsay objection, arguing that there was even less indicia of trustworthiness and reliability with respect to the statements made by Alizabeth during the forensic interview because those statements, unlike the earlier ones to Zesmery and Borders, were not made spontaneously or in confidence but, instead, were made in response to questioning in ongoing litigation and with law enforcement present.

The petitioner's counsel responded that the respondent father's argument relied on analysis taken from criminal cases that was not applicable to the present case, under which the hearsay statements to Borders were admissible pursuant to § 46b-129 (g) because she was a mandated reporter. The petitioner's counsel also argued, in the alternative, that courts routinely have determined that hearsay statements made by sexual assault victims during forensic interviews are admissible under the medical treatment exception to the hear-

say rule. The court again overruled the hearsay objection of the respondent father's counsel.[18] Borders then testified that Alizabeth had told her during the interview that the children had made the respondent father aware in April, 2021, of the respondent mother's infidelity and the physical and sexual abuse they had suffered but that the respondent father's response to the disclosures was focused on the respondent mother's infidelity, not on the abuse allegations.

Finally, during Borders' testimony, the petitioner's counsel sought to admit as a full exhibit Borders' affidavit that had accompanied the neglect petitions and motions for ex parte orders of temporary custody, which had been marked for identification as exhibit A. The respondent father's counsel objected that the affidavit was hearsay and that, because Borders was available to testify, there was no reason for the affidavit to be admitted. He further argued that, to the extent that the petitioner was offering the affidavit pursuant to § 46b-129 (g), which allowed the petitioner to admit an affidavit from a mandated reporter without the need for the mandated reporter to appear and testify unless called by a respondent parent or a child, the petitioner's reliance on the statute was misplaced. The respondent father's counsel continued: "[I]t's apparent to me that the statute . . . is designed as a means to streamline the trial. Once the witness has testified . . . I don't think it applies any longer. I can get into that there's hearsay within hearsay in it as well . . . ."

The petitioner's counsel responded that the statute only contemplates that, at a contested hearing, a court may admit into evidence an affidavit from a mandated reporter in lieu of that reporter's live testimony but does not expressly preclude the petitioner from offering both live testimony and an affidavit. As to the issue of hearsay within hearsay, the petitioner's counsel generally relied on the fact that any hearsay statements contained in the affidavit would have been admissible if provided at the hearing by Borders under the § 46b-129 (g) hearsay exception.

The court overruled the objection of the respondent father's counsel and granted the request of the petitioner's counsel to admit the affidavit as a full exhibit. The court agreed with the petitioner's counsel that the express language of § 46b-129 (g) addressed a situation unlike what was currently before the court and, thus, the statute had "very limited applicability to the situation at hand." The court, however, provided no other legal rationale for its admission of the affidavit. The court allowed the respondent father's counsel to make arguments as to why individual paragraphs of the affidavit should be excluded but overruled each such objection, consistent with its prior rulings, concluding that hearsay statements made to a mandated reporter met § 46b-129 (g)'s admissibility requirements. After the

respondent father's counsel concluded his cross-examination of Borders, the petitioner rested. As previously indicated, the respondent father was the sole witness to testify on his behalf, and he offered no exhibits.

B

We turn next to a discussion of legal principles relevant to our consideration of the intended meaning and scope of the hearsay exception in § 46b-129 (g). At the outset, we note that the rules of evidence—including the prohibition on the admission of hearsay statements not covered by an exception—apply to juvenile proceedings, which include child protection matters, to the same extent that they do in other civil proceedings. See General Statutes § 46b-121; see also Conn. Code Evid. §§ 1-1 (b) and commentary (b) (5), and 8-2 (a).[19] "[C]ertain procedural informalities" are authorized in juvenile proceedings under our common law, including "a liberal rather than a strict application of the formal rules of evidence, provided due process is observed." (Citation omitted; internal quotation marks omitted.) *In re Juvenile Appeal (85-2)*, 3 Conn. App. 184, 190, 485 A.2d 1362 (1985). Any such looser application of the rules of evidence, however, including the rule against hearsay, is unwarranted "[if] such evidence is likely to be determinative of the matter," in which case, "the court should return to the more formal rules of evidence." (Internal quotation marks omitted.) Id. Given the significant rights that a parent has "in the companionship, care, custody, and management of his or her children . . . laxity in procedural safeguards cannot be swept away by mere reference to the so-called informalities of [j]uvenile [c]ourt procedure." (Citations omitted; internal quotation marks omitted.) *Anonymous* v. *Norton*, 168 Conn. 421, 425, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Accordingly, unlike in proceedings in which no adherence to the rules of evidence is required, courts in juvenile proceedings, despite their inherently informal nature, must remain cautious in admitting hearsay statements that go to the very heart of the issue to be decided.

"[O]ut-of-court statements offered to establish the truth of the matter asserted are hearsay. Such statements generally are inadmissible unless they fall within an exception to the hearsay rule. A hearsay statement that does not fall within one of the traditional exceptions to the hearsay rule nevertheless may be admissible under the residual exception to the hearsay rule provided that [1] the proponent's use of the statement is reasonably necessary and [2] the statement itself is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." (Internal quotation marks omitted.) *In re Tayler F.*, supra, 296 Conn. 536.

As previously noted in this opinion, § 46b-129 (g) sets

forth a limited statutory exception to the hearsay rule that, by its express terms, is applicable only at a contested hearing on an ex parte order of temporary custody. Section 46b-129 (g) was enacted in 1998; see Public Acts 1998, No. 98-241, § 5; *prior to the adoption of the Connecticut Code of Evidence*, and provides in relevant part that "credible hearsay evidence regarding statements of the child or youth made to a mandated reporter or to a parent may be offered by the parties and admitted by the court upon a finding that the statement is *reliable and trustworthy* and that admission of such statement is *reasonably necessary* . . . ." (Emphasis added.) It is the meaning of the term "reasonably necessary," and its application in this context, that is at the heart of the dispute in the present appeal.[20]

Because our resolution of the respondent father's claim requires us to engage in statutory construction, we first look to the statutory language at issue to determine whether its meaning is clear and unambiguous. General Statutes § 1-2z. We conclude that the phrase "reasonably necessary," as used in § 46b-129 (g) as a requisite for the admission of evidence, is ambiguous for the following reasons. First, the phrase "reasonably necessary" is not expressly defined in the statute itself or in any directly related statute. Second, the phrase, in common parlance, is broad, and, as used in this context, it is susceptible to a number of reasonable interpretations. For example, as argued by the petitioner, "reasonably necessary" could plausibly and simply mean that the proffered hearsay statement contains relevant information needed to prove a material fact at issue. Likewise, "reasonably necessary" could mean that admission of the hearsay statement is permitted because the matter asserted could not be proven by any other available means. Third, our residual hearsay exception, as codified in the Connecticut Code of Evidence, uses the similar, albeit not identical, term "reasonable necessity," which has gained its own meaning and, thus, adds to the ambiguity of the statutory language. Conn. Code Evid. § 8-9. Because the language is ambiguous, we must consider extratextual sources to aid our construction, including available legislative history and similar statutes. See, e.g., *Ledyard* v. *WMS Gaming, Inc.*, 338 Conn. 687, 699, 258 A.3d 1268 (2021).

As already indicated, at the time § 46b-129 was enacted in 1998, an analogous term to "reasonably necessary" already was associated with our common law's residual, or catchall, exception to the hearsay rule. In 1985, our Supreme Court stated that, in considering whether a hearsay statement not admissible under a traditional hearsay exception nonetheless may be admissible under the residual hearsay exception, the proper "analysis must focus on (1) whether there was a *reasonable necessity* for the admission of the statement, and (2) whether the statement was supported by the equivalent guarantees of reliability and trustworthi-

ness essential to other evidence admitted under the traditional hearsay exceptions." (Emphasis added.) *State* v. *Sharpe*, 195 Conn. 651, 664, 491 A.2d 345 (1985). The court explained that reasonable necessity in that context is established by demonstrating that, "unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead *or otherwise unavailable*, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Emphasis added.) Id., 665. The Connecticut Code of Evidence later adopted the court's language in *Sharpe* in its own statement of the residual hearsay exception. See Conn. Code Evid. § 8-9 and commentary.

In discussing the unavailability requirement of the residual hearsay exception as it was later codified in our code of evidence, the court in *In re Tayler F.*, supra, 296 Conn. 546–47, stated: "If the opposing party makes a hearsay objection to the admission of the child's statement, the party seeking admission of the statement *has the burden to prove the child's unavailability.* . . . The trial court has discretion to accept an uncontested representation by counsel for the offering party that the child is unavailable due to psychological harm. . . . If the other party challenges that representation, proof of psychological harm must be adduced at an evidentiary hearing, either from an expert or another uninterested witness with knowledge of the child or from the court's in camera interview of the child, with or without counsel. . . . Finally, a finding of psychological unavailability requires the court to find that the child will suffer serious emotional or mental harm if required to testify. . . . [A] finding that it is not in the best interest of the child to testify is not equivalent to psychological harm. . . . Rarely will it be in a child's best interest to testify."[21] (Citations omitted; emphasis added; footnotes omitted.) Accordingly, the court in *In re Tayler F.* established that, in order to demonstrate a "reasonable necessity" for the admission of a child's hearsay statement, the proponent of the admission of the hearsay statement had to establish the child's unavailability to testify in person, either due to a risk of serious emotional or mental harm or some other recognized legal basis.

The respondent father argues that the phrases "reliable and trustworthy" and "reasonably necessary" as used in § 46b-129 (g) are nearly identical to the requirements found in the residual hearsay exception as discussed in *In re Tayler F.* (Internal quotation marks omitted.) Relying on General Statutes § 1-1 (a),[22] he argues that those phrases have " 'acquired a peculiar and appropriate meaning in the law' " identical to the meanings given to the requirements of the residual hearsay exception as set forth in *In re Tayler F.* Therefore, he argues, the phrases should " 'be construed and understood accordingly.' " He further argues that the

statute's legislative history supports his assertion that the legislature intended essentially to graft the residual hearsay rule into the child protection statute. The petitioner responds that the legislative history of the enactment of § 46b-129 (g) supports the contrary conclusion, namely, that this statutory exception to the hearsay rule was intended to be less stringent in its application than the residual hearsay exception.

In support of their disparate interpretations, both parties focus on testimony given at the March 20, 1998 public hearing on the proposed bill by then Judge, now Justice, Christine Keller, who, at the time of her testimony, was the Chief Administrative Judge for the Superior Court for Juvenile Matters. Neither party, however, brings to our attention the important fact that the bill that was the subject of Justice Keller's testimony at the public hearing did not include the language that is now in dispute, which was subsequently added by way of amendment. We conclude, on the basis of our review of the legislative history, including how and when the disputed language was added to the legislation, that a proper interpretation of the statute cuts closer to the respondent father's interpretation, although we are not persuaded that the legislature expressed any intent to adopt the strict unavailability requirement of the residual hearsay exception. At this point, a discussion of the legislative history as well as some additional background context is required.

C

We begin by noting that the changes that the legislature enacted in 1998 with respect to ex parte orders of temporary custody were a direct response to changes to federal law as well as a pending lawsuit that had been brought by a respondent mother in a child protection action, both on behalf of herself and on behalf of "a class of persons consisting of all parents in the state whose children have been or may be seized by the [department], and who have been or may be denied their statutory and constitutional right to challenge the state's temporary custody in a timely evidentiary hearing." *Pamela B.* v. *Ment*, 244 Conn. 296, 299, 709 A.2d 1089 (1998); see id., 307 (appeal considering, inter alia, justiciability of underlying action); see also 41 H.R. Proc., Pt. 12, 1998 Sess., p. 4165, remarks of Representative Christel Truglia. The action was brought against Judge Aaron Ment, in his capacity as chief court administrator, and Linda D'Amario Rossi, who, at the time, was the Commissioner of Children and Families, and sought both declaratory and injunctive relief. *Pamela B.* v. *Ment*, supra, 299. According to the plaintiff in *Pamela B.*, courts in this state routinely would order a continuance of the hearing that was required within ten days following the granting of an ex parte order of temporary custody and consolidate that hearing with the adjudication of the merits of the contemporaneously

filed neglect petition, which meant the ex parte order could remain in effect for many months without any opportunity for the respondent parent to challenge it. See *Pamela B.* v. *Ment*, Docket No. CV-95-0556127-S, 1997 WL 88212, *1 (Conn. Super. February 13, 1997), rev'd, 244 Conn. 296, 709 A.2d 1089 (1998). The plaintiff claimed that this practice violated her due process rights under our federal constitution as well as under article first, § 10, of the state constitution, in light of the significant rights at stake in such proceedings. Id. The plaintiff alleged that the delay in providing a contested hearing was the result of "an increase in the number of [order of temporary custody] applications, unreasonably crowded juvenile dockets, insufficient staffing of the juvenile courts and inadequate allocation of judicial resources . . . ." Id.[23]

With that background in mind, we turn next to a discussion of the language of this statutory hearsay exception, both as originally proposed and as eventually enacted. The language of the bill as first proposed, and on which Justice Keller and others testified, was as follows: "At a contested hearing on the order for temporary custody or order to show cause *credible hearsay evidence regarding statements of the child or youth may be offered by the parties and admitted at the discretion of the court.* The petitioner may submit a signed affidavit executed by a mandated reporter without the need for the mandated reporter to appear and testify unless called by a respondent, provided the affidavits are submitted to all parties appearing at the preliminary hearing. The affidavits, while not conclusive, shall constitute prima facie evidence of the facts alleged to support the maintenance of an order of temporary custody pending a trial on the merits of the petition or petitions." (Emphasis added.) Substitute House Bill No. 5745, 1998 Sess.

Thus, as originally drafted, the proposed bill gave the court extremely broad discretion to admit any hearsay statement that it deemed credible, which we construe as a far more permissive standard than what appears in the final bill enacted by the legislature. The amended language—which added the "reliable and trustworthy" and "reasonably necessary" requirements—first appeared in a House amendment that was adopted on May 4, 1998, without any discussion or explanation for the changes made to the original bill. Substitute House Bill No. 5745, 1998 Sess., as amended.

At the public hearing on the original bill, Justice Keller testified that the Judicial Branch was fully supportive of the proposed legislation, which would require courts to hold a contested hearing within ten days if requested by a parent at the initial hearing on an ex parte order of temporary custody. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1998 Sess., pp. 1877–78, testimony of Judge Christine Keller. She testi-

fied: "[W]e can do that, but . . . *we see a need to try to shorten the length of these hearings* because the immediacy of this hearing is to determine whether or not, pending the outcome of the neglect case, the child should remain in the custody of [the department] and, for that reason, we are proposing that you allow us to submit as prima facie evidence, subject to the parent's right to call the witness or call the person and cross-examine them, affidavits of mandated reporters, and also allow us to submit credible hearsay. We examined other states' procedures in these cases to see if they do it better or why are they doing it faster and there's really two basic reasons why they do it faster in other states.

"One, is that they allow documents, affidavits, hearsay statements of the children that are trustworthy and other credible hearsay into evidence at these hearings, and two, they have a lower standard. It's probable cause in many other states. In our state, by judicial fiat, [a]ppellate court rulings, it's fair preponderance of the evidence, which is a higher standard." (Emphasis added.) Id., p. 1877.

One representative, Robert Farr, noting written testimony that opposed the new hearsay exception contained in the proposed legislation, asked Justice Keller to discuss whether this type of hearsay exception was found in the child protection statutes of other states. Id., p. 1881. The relevant colloquy was as follows:

"[State Representative] Farr: Let me just ask you, just for the record, we've got some testimony, written testimony from Paul Chill from the [University of Connecticut School of Law] and criticizing some parts of this. One of the issues is, of course, the hearsay question and am I correct in understanding your testimony, J[ustice] Keller, that this [is] common language in other states?

"[Justice] Keller: Yes. As a matter of fact, the one state that we actually had a meeting here on a few months ago, Rhode Island. They have a rule of evidence that allows—a statement that a child that the judge deems would be someone the child trusts would be admissible.

"I want to point out too that, under our present civil law, in other kinds of civil cases and our cases are civil cases and the standard of proof in [an] order of temporary custody hearing is the same as it is in every other civil case, fair preponderance of the evidence. We allow reports of physicians, nurses, doctors, psychologists to be admitted into evidence without the need for that person to come and testify. We allow that in the trial on the final merits of the case and the only cautionary reservation, and we've got that proposed, is that we're requiring that, if [the department] wishes to rely on an affidavit of a mandated report, it has to have

that affidavit ready to provide to counsel for the parents at the preliminary hearing, that's the hearing held within the first ten days, and then that parent would have the right to request that the mandated reporter come to testify and utilize subpoenas if need be.

"Now, most of our parents are indigent. They cannot afford subpoenas, but in the juvenile court the procedure which is authorized by Practice Book rule is that the lawyers representing the indigent parents would request that the clerk issue summons or subpoenas. And we only need to do that [eighteen] hours before the scheduled contested hearing.

"[State Representative] Farr: Let me ask you this. The language that was proposed—I don't have it right in front of me—as I recall it, you said includes other credible hearsay evidence, which goes beyond the reports for the mandated reporters.

"[Justice] Keller: Right.

"[State Representative] Farr: What would that include?

"[Justice] Keller: Well, it's kind of similar to what we now have, which is sort of a catchall exception to the hearsay rule anyway, where the trustworthiness of the statement makes it so inherently reliable that the court has been allowed to get it in, even though arguably it might always be considered hearsay.

"Statements that a child might make to another parent, someone to whom the child trusts, as in the case in Rhode Island. Also, some statements, not in affidavit form, might come in anyway under other rules that are routinely adopted and accepted.

"For example, a police report could come in under a business records exception without the need for the actual author of that report to testify. Many [department] records would be considered business records. We have a procedure already in the juvenile court where social studies, which is the required study that a worker must have prepared for the courts of its investigation and conclusions for the court's assistance in every neglect or uncared for case. That is allowed in, as long as the worker is there, prepared to testify, or prepared to be subjected to cross-examination.

"So, we already have a number of exceptions which— also, hospital records would be another example. If we had a seriously abused child or a child who['s] born severely addicted to toxic substances and we're using that as evidence, even without an affidavit or without testimony, those hospital records come in as business records under the exception carved out by [General Statutes §] 4-104. I don't think we're broadening expansively the use of evidence that isn't already used in many of our temporary custody hearings." Id., pp. 1881–83.

Attorney Sharon Wicks Dornfeld also provided a writ-

ten statement to the committee that supported the original bill's proposal with respect to the admission of hearsay statements of children subject to ex parte orders of temporary custody, noting in relevant part: "As a practical matter, it is often nearly impossible to balance the child's welfare with the rules of evidence. On the one hand, the child's statements are often the best—even only—evidence of the need for protection. On the other, the experience of testifying against a parent is often itself damaging to a child, and bringing him into the courtroom must be a last resort. The proposed language is a reasonable accommodation for this problem." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1998 Sess., p. 2143, statement of Attorney Sharon Wicks Dornfeld. Judge Ment also provided a written statement to the committee consistent with Justice Keller's testimony that "[a]llowing credible hearsay at the hearing on the order for temporary custody is essential for cases to be resolved as quickly as possible . . . ." Id., p. 2146, statement of Judge Aaron Ment.

The committee also received written testimony and statements offered in opposition to the bill. The Legal Assistance Resource Center of Connecticut, Inc., recommended amending the original bill's proposed hearsay exception, providing via a statement in relevant part: "The bill should . . . be amended in the following ways . . . Hearsay evidence at the [order of temporary custody] hearing should not be permitted. A live witness is needed, not only for cross-examination but also so that the court can make an independent determination of the need for an [order of temporary custody]." Id., p. 2172. Furthermore, Professor Paul Chill of the University of Connecticut School of Law, who represented the plaintiffs in the *Pamela B.* case and whose testimony was referenced by Representative Farr, provided the following relevant written testimony in opposition to the bill: "[H.B.] No. [5745] would further gut due process protections for parents and children by permitting affidavits by mandated reporters to be admitted into evidence in lieu of live testimony. . . . Many affidavits one sees in juvenile court proceedings are replete with hearsay, supposition, bald, subjective opinion and bias, and it is often impossible to tell, although one may suspect it, just how little education and experience some mandated reporters have in child protection. This is where large mistakes are made and compounded. It would be folly to permit as momentous a decision as whether a child will remain in foster care for several months to be based on such documents." Id., p. 2190, statement of Paul Chill.

As noted, following the public hearing, the proposed bill was amended in the House of Representatives on May 4, 1998, without any explanation or further discussion on the record. The amendment added the "reliable and trustworthy" and "reasonably necessary" requirements, the language that ultimately was enacted and

is now found in § 46b-129 (g). It is unclear from the legislative history itself whether the changes were made in response to the opposition to the original bill, but it is undeniable that this added language placed additional guardrails on the court's discretion to admit at a contested hearing hearsay statements it deems "credible."

We glean the following conclusions from this legislative history. First, it is relatively clear from the amendment to the original bill that the legislature was uncomfortable with the breadth of the exception to the hearsay rule that was contained in the original bill. The addition of the "reliable and trustworthy" and "reasonably necessary" language evinces an intent to narrow, at least to some extent, the exception contained in the prior version of the bill.

Second, we are not persuaded by the respondent father's contention that the drafters of the amendment sought to codify the residual hearsay exception as it existed at common law. After all, the residual hearsay exception already was applicable in child protection proceedings, as indicated by Justice Keller in her testimony, and applied to all hearsay, not just to the hearsay statements of children made to mandated reporters, statements that the bill expressly sought to distinguish. In other words, the statutory exception arguably would be superfluous because the common-law residual exception to the hearsay rule was already applicable to hearings on orders of temporary custody. "We are mindful that, [i]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *In re Jusstice W.*, supra, 308 Conn. 664; see id. (refusing to adopt interpretation of statutory provision that would render other provision in statute superfluous).

Instead, we view the bill, as enacted, as representing a compromise between advocates of the position that credible hearsay statements should be generally admissible without additional safeguards and advocates of the position that such hearsay statements should be admitted only if the statements meet the stringent admissibility requirements of the common-law residual exception to the hearsay rule, including a showing of the "unavailability" of the declarant as a witness.

This interpretation is buttressed by consideration of the underlying goals and concerns that motivated the legislation. Those goals included ensuring that parents were provided with an opportunity for a prompt hearing in light of the significant rights at stake, while also protecting the best interests of children, including their interest to be free from physical abuse and neglect. An additional goal was to make contested hearings more efficient, given the limited resources of both time and personnel, thereby increasing the court's ability to hold more contested hearings within the desired and short-

ened ten day time frame. One of the ways in which hearings could be expedited and made more efficient would be by streamlining the presentation of evidence and reducing the number of witness needed to be called. Considering the legislation with those goals in mind, we construe the addition of the "reasonably necessary" language not as requiring unavailability as a prerequisite to the admission of hearsay statements made by children to a mandated reporter but as requiring the court, before admitting such a hearsay statement under § 46b-129 (g), to consider a number of factors in light of the specific circumstances of the case before it. Those factors would include, but are not necessarily limited to: (1) the age of the child involved; (2) the materiality of the offered hearsay statement; (3) the likelihood of prejudice to the respondent parent due to the inability to cross-examine the child regarding the hearsay statement;[24] (4) any difficulties in obtaining the in-person testimony of the child; and (5) consideration of whether in-court testimony could result in emotional or mental harm to the child.[25] Considering these factors will require trial courts to weigh the state's interest in conducting hearings on orders of temporary custody in a timely and efficient manner, protecting the procedural rights of the respondent parents to challenge the evidence presented by the petitioner, and ensuring that the children who are the subject of the proceeding are protected from unnecessary psychological harm. It bears emphasizing though that the proponent of the hearsay evidence has the burden of tipping the balance in favor of admissibility by establishing that, in light of these factors, the hearsay evidence is reasonably necessary. For example, if an older child is readily available to testify, all else being equal, there would be little reason to conclude that the introduction of the child's hearsay statements was reasonably necessary. The calculus could change though if the proponent of the hearsay evidence presented evidence that, due to the child's relationship with the respondent parent, testifying would be particularly harmful to the child. Ultimately, trial courts must use their sound discretion in deciding whether to employ the statutory exception, and we will reverse such determinations only for an abuse of that discretion.

Having construed what "reasonably necessary" means for the purposes of § 46b-129 (g)'s hearsay exception, we now turn to the evidence identified by the respondent father that he asserts the court improperly admitted into evidence at the contested hearing.

### D

The first and broadest category of inadmissible hearsay identified by the respondent father involves the testimony of Zesmery and Borders, each of whom was permitted by the court to recount various out-of-court statements made to them by the children over the hear-

say objections of the respondent father's counsel. In so doing, the court never directly addressed the dispute between the parties regarding the meaning of "reasonably necessary" as used in § 46b-129 (g); it simply concluded that the statements were reliable and trustworthy and that their admission was reasonably necessary. Nevertheless, we may presume that, in ruling in favor of the petitioner and allowing the testimonial hearsay statements into evidence, the court accepted the rationale offered by the petitioner's counsel, which did not include any reasoned consideration regarding the availability of the children to appear and testify. The court made no finding that the children would have suffered psychological harm from testifying or that there was any other reasonable basis for the petitioner not to have presented the in-court testimony of the children. Although the petitioner's counsel argued that testifying likely would be difficult and potentially harmful to the children, the court was not free to accept that representation without some supporting evidence, given that the respondent father contested it. See *In re Tayler F.*, supra, 296 Conn. 546–47. Specifically, the respondent father's counsel argued to the court that these were not young children but teenagers and, thus, they could easily have been brought to court to testify and that his inability to cross-examine them was particularly prejudicial.

In light of our conclusion that the petitioner has the burden to establish a reasonable basis for why it was not possible to have the children testify at the contested hearing in order to establish that the admission of their hearsay statements were "reasonably necessary," we agree with the respondent father that the court abused its discretion in failing to sustain his counsel's objections to the admission of the hearsay statements in the present case. In arguing in favor of the admissibility of the children's hearsay statements, the petitioner's counsel focused on the reliability of the hearsay statements rather than on whether it was reasonably necessary that they be admitted as hearsay. In short, the petitioner's counsel seemed to believe that it was sufficient to establish that the children's statements were made to a mandatory reporter and had some independent indicia of reliability. The respondent father's counsel, however, argued that because the children were older, they should have been summoned to testify at the hearing. Other than a bald assertion that the children would suffer harm if required to testify in person, the petitioner's counsel offered nothing to support a finding of emotional or mental harm, nor did the court make such a finding. The petitioner's counsel offered no other reasonable basis that would justify the decision not to call the children to testify, other than that their statements were reliable. Moreover, in this case, the allegations of physical and sexual abuse all involved the respondent mother or her boyfriends. The evidence

before the court was that the respondent mother remained in Puerto Rico and had been defaulted in the proceeding, so there was little chance of the children being confronted by her at the hearing. The court offered no analysis supporting its conclusion that the admission of the hearsay statements was "reasonably necessary." Having thoroughly reviewed the record and arguments of the parties, we conclude that the court's decision to overrule the hearsay objections of the respondent father's counsel, under the circumstances of the present case, was error.

E

In addition to the court's erroneous admission of the children's various hearsay statements through the testimony of Borders and Zesmery, the respondent father also challenges the admission of the petitioner's exhibits on hearsay grounds. Exhibits B and E each contained hearsay statements that the court determined were admissible under § 46b-129 (g). Exhibit B contained the screenshots of the three Snapchat messages between the children and Zesmery. Exhibit E was a copy of a text message from Zesmery to Borders that memorialized a conversation that Zesmery had with Alyson. For the same reasons that the hearsay statements of the children offered through the testimony of Zesmery and Borders were improperly admitted by the court pursuant to § 46b-129 (g), exhibits B and E should not have been admitted as full exhibits.

With respect to the admission of exhibits C and D, the photographs that Zesmery received from the children of an injury to Alizabeth's ear and a broken door that were offered by the petitioner as corroborating evidence of the alleged physical abuse of the children by the respondent mother, the respondent father argues that they were improperly admitted into evidence by the court through Zesmery because she did not have personal knowledge necessary to authenticate the photographs. According to the respondent father, in attempting to authenticate what was depicted in the photographs, Zesmery relied entirely on what she was told by the children and not her own knowledge. We agree that the photographs improperly were authenticated through the use of hearsay and, thus, the court should have denied the admission of exhibits C and D.

Pursuant to the Connecticut Code of Evidence, "[t]he requirement of authentication as a condition precedent to admissibility is satisfied by *evidence* sufficient to support a finding that the offered evidence is what its proponent claims it to be." (Emphasis added.) Conn. Code Evid. § 9-1 (a). The Connecticut Code of Evidence, including its bar against the admissibility of hearsay statements not covered by an exception, applies equally to evidence offered for the purposes of authentication. See Conn. Code Evid. § 1-3 (b), commentary (b) ("Code applies in making determinations required by [§] 1-3

(b)," and evidence offered for purposes of authentication is "example of an instance in which the relevance of evidence to the case depends upon the existence of another fact or other facts" to which § 1-3 (b) of Connecticut Code of Evidence applies). Although the code does not apply to "[p]roceedings involving questions of fact preliminary to admissibility of evidence pursuant to [§] 1-3 of the Code"; Conn. Code Evid. § 1-1 (d) (2); evidence relating to the authentication of proffered evidence must itself be in admissible form because it is ultimately for the trier of fact to determine whether the evidence is what it purports to be. See *State* v. *Porfil*, 191 Conn. App. 494, 519–21, 215 A.3d 161 (2019), appeal dismissed, 338 Conn. 792, 259 A.3d 1127 (2021). Because we have determined that the children's hearsay statements constituted inadmissible evidence, these statements were equally inadmissible for the purpose of authenticating exhibits C and D. Accordingly, those exhibits were improperly admitted.

F

Finally, we turn to the court's admission of exhibit A, Borders' affidavit filed in support of the neglect petitions and motions for orders of temporary custody. Borders' affidavit was admitted by the court under the "affidavit provision" of the hearsay exception in § 46b-129 (g). The respondent father's counsel objected to the admission of the affidavit. Although he acknowledged that affidavits by mandated reporters such as Borders generally would be admissible pursuant to the statute, he argued that the affidavit was inadmissible in the present case because Borders already had provided direct testimony consistent with the contents of her affidavit and because it contained hearsay statements of the children and, thus, amounted to impermissible hearsay within hearsay. The court overruled the objection on the ground that the statute did not expressly limit the admissibility of affidavits to cases in which the affiant did not testify, and because the court already had ruled that the children's hearsay statements were themselves admissible under § 46b-129 (g). We agree that the affidavit was improperly admitted in full because it contained inadmissible hearsay statements of the children.

Section 8-7 of the Connecticut Code of Evidence provides that "[h]earsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception." An affidavit is an out-of-court statement and, thus, generally is inadmissible to prove the truth of the matter asserted therein unless it falls within a hearsay exception. See, e.g., *Burritt Mutual Savings Bank of New Britain* v. *Tucker*, 183 Conn. 369, 375, 439 A.2d 396 (1981). For purposes of our analysis in the present case, we assume, without deciding, that Borders' affidavit was admissible under § 46b-129 (g), despite her presence and testimony at

the hearing. Nevertheless, for the same reasons that Borders' testimony regarding the children's hearsay statements were inadmissible, like statements of the children remained inadmissible to the extent that they were repeated in the affidavit.

In sum, we agree with the respondent father that the court abused its discretion by admitting various hearsay statements of the children, in their many forms, because the petitioner failed to meet her burden under the statute of demonstrating that the admission of those statements was "reasonably necessary" as we have construed that term in the context of a contested hearing on a motion for an order of temporary custody. Although we must also address whether the evidentiary errors were harmful, we turn to that question after reviewing the alternative basis on which the court admitted some of the same hearsay statements.

II

The respondent father next claims that the court improperly admitted those hearsay statements made by Alizabeth to Borders during the forensic interview on the alternative ground that they fell under the medical treatment exception to the hearsay rule. The respondent father argues in particular that the petitioner failed to demonstrate that Alizabeth understood at the time that she made the statements that the forensic interview, at least in part, was for a medical purpose. The petitioner contends that we should reject this claim because the respondent father failed to raise it before the trial court and, even if he did, the argument fails on its merits because there was evidence presented from which the court reasonably could have inferred that Alizabeth understood that the interview had a medical purpose. We agree with the respondent father. The following additional facts are relevant to our resolution of this claim.

As stated previously in part I of this opinion, during her direct testimony, Borders was asked about a conversation that she had with the children on the day they were removed from the respondent parents' home and during their transport to their placement. Borders testified that, during that conversation, she had "introduced them to the forensic interview process," but she provided no details about what she had told them or whether her discussion of the "process" included any discussion of the *purpose* for a forensic interview. Borders later testified that she eventually conducted a forensic interview of Alizabeth on June 1, 2021. Borders was asked about and testified to her understanding of the purpose for a forensic interview, which she stated was "done in conjunction with law enforcement," and was "to interview [the] children in a controlled environment, neutral environment and gather information so that we can ensure [their] physical, emotional, mental safety and well-being." When asked why the other chil-

dren had not participated in the forensic interview, Borders testified that Alizabeth had told her that "because she was the oldest, if somebody was gonna be blamed for coming forward she wanted it to be her so that her sisters couldn't be blamed."

The forensic interview was conducted at the Child Advocacy Center in Danielson. In attendance and observing the interview from outside of the interview room were an advocate from the Sexual Assault Crisis Center of Eastern Connecticut, another forensic interviewer, the director of the Child Advocacy Center, and three members of law enforcement. Nothing in the record suggests that any medical professional took part in the interview or examined or treated Alizabeth either before or after the interview.

Borders testified that, during the interview, Alizabeth repeated the accusations that the children initially had made regarding physical and sexual abuse and also provided new information. When asked by the petitioner's counsel what new information Alizabeth had provided, the respondent father's counsel renewed his earlier hearsay objection, arguing with respect to the statutory hearsay exception that there was even less indicia of trustworthiness and reliability with respect to the statements that Alizabeth made during the forensic interview because those statements, unlike the earlier statements to Zesmery and Borders, were not made spontaneously or in confidence. Rather, he argued, the statements made during the forensic interview were made in response to questioning in ongoing litigation and with law enforcement present.

The petitioner's counsel responded to the objection of the respondent father's counsel first by reiterating that the statements that Alizabeth made to Borders during the interview were fully admissible under § 46b-129 (g) because Borders was a mandated reporter. The petitioner's counsel also argued in the alternative, however, that courts routinely found hearsay statements made by sexual assault victims during forensic interviews to be admissible under the medical treatment exception to the hearsay rule.

With respect to whether the medical treatment exception provided an alternative basis for the admission through Borders of Alizabeth's statements made during the forensic interview, the respondent father's counsel first argued that he believed that the exception is limited to hearsay statements offered through expert testimony by a medical professional. After the petitioner's counsel disputed that argument as unfounded and after it was squarely rejected by the court, the respondent father's counsel made the additional argument that he had not "heard any evidence at all that there's been, you know, any medical treatment undertaken or planned to be undertaken on the basis of [the forensic] interview." The court overruled the hearsay objection of the respon-

dent father's counsel.

Borders then testified that Alizabeth had told her during the interview that the children had made the respondent father aware in April, 2021, of the respondent mother's infidelity and the physical and sexual abuse they had suffered at the hands of the respondent mother but that the respondent father's response to the disclosure was focused on the respondent mother's infidelity, not the abuse allegations. Borders never was asked by the petitioner and never testified that she had explained to Alizabeth that one of the purposes of the forensic interview was to address any potential medical issues arising from any alleged abuse. No other evidence was presented suggesting that Alizabeth understood that her participation in the forensic interview was pertinent to a medical diagnosis or treatment.

A

Section 8-3 (5) of the Connecticut Code of Evidence contains an exception to the hearsay rule for "[a] statement made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment." In discussing this exception, this court has explained that, "[r]egardless of whether the statements were made to a physician, they must all have been made in furtherance of medical treatment. . . . In fact, the medical treatment exception is not limited to physicians and has been extended to include social workers, as long as the social worker is found to have been acting within the chain of medical care. . . . Although [t]he medical treatment exception to the hearsay rule requires that the statements be both pertinent to treatment and *motivated by a desire for treatment . . .* in cases involving juveniles, our cases have permitted this requirement to be satisfied inferentially." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Juan V.*, 109 Conn. App. 431, 446–47, 951 A.2d 651, cert. denied, 289 Conn. 931, 958 A.2d 161 (2008). Accordingly, "[t]he rationale underlying the medical treatment exception to the hearsay rule is that the patient's desire to recover his [or her] health . . . will restrain him [or her] from giving inaccurate statements to a physician [or other professional] employed to advise or treat him [or her]. . . . The term medical encompasses psychological as well as somatic illnesses and conditions." (Citation omitted; internal quotation marks omitted.) *State* v. *Freddy T.*, 200 Conn. App. 577, 591, 241 A.3d 173 (2020).

As this court explained in *Freddy T.*, however, "[t]he statements of a declarant may be admissible under the medical treatment exception [only] if made in circumstances from which it reasonably may be inferred that *the declarant understands that the interview has a*

*medical purpose.* Statements of others, including the interviewers, may be relevant to show the circumstances. . . . [Thus] the focus of the medical treatment exception is *the declarant's* understanding of the purpose of the interview . . . . Accordingly, the inquiry must be restricted to the circumstances that could be perceived by the declarant, as opposed to the motivations and intentions of the interviewer that were not apparent to the declarant. . . . This focus accords with the rationale for the medical diagnosis and treatment exception that patients are motivated to speak truthfully to their medical care providers when their own well-being is at stake." (Citations omitted; emphasis altered; internal quotation marks omitted.) Id., 592–93. In other words, under our case law applying the medical treatment exception, the proponent must show not only that the forensic interview in fact had some medical purpose but that the declarant understood this to be the case.

In *Freddy T.*, we agreed with the defendant that portions of a video recording of a forensic interview containing statements by the victim, a five year old child, should not have been admitted into evidence under the medical treatment exception. Id., 585, 590, 593. The defendant had argued that the real purpose of the interview was to aid the police investigation and not to provide medical treatment for the child because any such treatment had concluded by the time the interview was conducted. Id., 589. We agreed and concluded that the content of the interview provided no basis from which to conclude that the child understood that the interview was for medical treatment purposes. Id., 593. There was no indication in the record that the child in *Freddy T.* had ever been told in advance that she would be meeting with any medical professionals. Id., 594. Although there was evidence that medical referrals were made *after* the interview concluded, this court stated that "[p]ro forma referrals at the end of an interview, even if fulfilled, do not satisfy th[e] requirement" that the declarant understand that there was a medical purpose for the interview at the time the declarant made the statements the proponent sought to admit under the medical treatment exception. Id., 595 n.16.

B

We first briefly address whether the respondent father's claim on appeal was properly raised before the trial court so as to preserve it for review. Although the petitioner argues that the claim is not preserved, we disagree.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must prop-

erly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush. . . .

"[T]he sina qua non of preservation is fair notice to the trial court. . . . An appellate court's determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated [in the trial court] with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Sease*, 147 Conn. App. 805, 813–14, 83 A.3d 1206, cert. denied, 311 Conn. 932, 87 A.3d 581 (2014).

We conclude that part and parcel of the objection by the respondent father's counsel to the admission of Alizabeth's forensic interview statements to Borders was that there was no evidence that any medical treatment or planned medical intervention occurred as a result of the forensic interview. He argued at one point that the statements made during the forensic interview were made in response to questioning in ongoing litigation and with law enforcement present, suggesting by implication that there was no basis on which to conclude that Alizabeth's statements were made for the purpose of obtaining medical treatment. We conclude that the arguments of the respondent father's counsel were sufficient to put the trial court on notice to consider whether all necessary requirements of admission under the medical treatment exception had been satisfied, which included whether the petitioner had met its burden of demonstrating that Alizabeth understood her statements to have been made in furtherance of medical treatment so as to fall within the exception.

C

We now turn to the merits of the respondent father's claim that, like in *Freddy T.*, the trial court was not presented with any evidence from which it reasonably could have inferred that Alizabeth understood the forensic interview to have a medical purpose. To the contrary, the record suggests that Alizabeth and her sisters understood the interview to be for investigatory purposes. This is borne out by the fact that the children elected to have only Alizabeth risk providing additional information to Borders during the forensic interview, thereby limiting the risk of angering the respondent

parents if they were implicated in wrongdoing. In other words, it appears clear that Alizabeth understood the purpose of the forensic interview to be to further the investigation against the respondent parents. Borders did testify that she previously had walked the children through the "forensic interview process . . . ." There was additional testimony from which to conclude that Borders herself understood that there was a potential medical treatment component of the interview. The record is entirely silent, however, as to whether Alizabeth understood this to be the case. No medical examination or interview with a medical professional occurred in conjunction with the forensic interview conducted by Borders from which such an understanding might have been inferred. Accordingly, to the extent that the court overruled objections to Borders' testimony about what Alizabeth had told her during the forensic interview under the alternative theory that the statements fell under the medical treatment exception to the hearsay rule, we conclude that it did so in error.

### III

Although we have determined that the court improperly admitted a number of hearsay statements and permitted the authentication of exhibits through the use of inadmissible hearsay, that determination is not itself fully dispositive of the respondent father's claims on appeal. He also must demonstrate that these evidentiary errors were harmful. *In re Tayler F.*, supra, 111 Conn. App. 36. The respondent father asserts that the erroneous evidentiary rulings were, in total, harmful because no other admissible evidence supports the court's conclusion that the petitioner met her burden with respect to sustaining the orders of temporary custody and, accordingly, the court's finding to the contrary is clearly erroneous. The petitioner counters that any errors in admitting the evidence were harmless because the court could have sustained the ex parte orders of temporary custody on the basis of other evidence that was admitted at the hearing. We agree with the respondent father.

As we have previously stated, "[p]ursuant to . . . § 46b-129 (b), the court may issue an order ex parte vesting in some suitable agency or person the child's or youth's temporary care and custody if it appears, on the basis of the petition and supporting affidavits, that there is reasonable cause to believe that (1) the child or youth is suffering from serious physical illness or serious physical injury or is in immediate physical danger from the child's or youth's surroundings, and (2) that as a result of said conditions, the child's or youth's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's or youth's safety . . . .

"At a subsequent hearing on an order of temporary custody, the proper standard of proof . . . is the normal civil standard of a fair preponderance of the evi-

dence. . . . We note that [a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *In re Kelsey M.*, supra, 120 Conn. App. 542–43.

In order to demonstrate that he was harmed by the court's evidentiary errors, the respondent father must show that it is likely that the outcome of the contested hearing would have been different. See *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 358, 907 A.2d 1204 (2006) (holding that standard in civil case for determining whether evidentiary ruling was harmful is whether "ruling [likely] would [have] affect[ed] the result" and citing *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990), as having rejected standard "that would have required treating as harmless error any evidentiary ruling, regardless of its effect upon verdict, so long as evidence not implicated by ruling was sufficient as matter of law to sustain verdict" (internal quotation marks omitted)), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007). In evaluating the potential effect of the court's evidentiary errors, we remain mindful that it is axiomatic that a prerequisite to a court's entry of a temporary order vesting custody of a child in one other than the child's parents is a finding that the child is *presently* suffering from a serious physical illness or serious physical injury or is in *immediate* physical danger. See *In re J.R.*, supra, 161 Conn. App. 573.

In arguing in her brief that the court's decision to sustain the orders of temporary custody was not clearly erroneous, the petitioner either relies on evidence that we have determined was inadmissible or evidence that fails to demonstrate any immediate need for the removal of the children. Outside of the inadmissible evidence, there is nothing in the record from which the court reasonably could have found that the children presently were in danger of a serious physical injury or illness, or that they were in any immediate physical danger from their surroundings. Even with the hearsay evidence, the petitioner's case was not particularly strong with respect to any immediate need to remove the children from their home. All the evidence of abuse implicated the respondent mother, and the evidence before the court demonstrated that she remained in Puerto Rico. Although there was testimony that the respondent father intended to have the respondent

mother return to the residence, there was no evidence that her return was imminent. In our view, without the improperly admitted hearsay testimony and exhibits, it is likely that the outcome of the hearing would have been different. Accordingly, the evidentiary errors were harmful and a new hearing on whether to sustain the orders of temporary custody is warranted.[26]

The judgments are reversed and the case is remanded for a new contested hearing on the ex parte orders of temporary custody.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** June 29, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent mother, Bernice T., has not contested the temporary custody orders and has not participated in the present appeal.

[2] The children were, respectively, sixteen, fifteen, and thirteen years old at the time of the contested hearing on the motions for orders of temporary custody.

[3] General Statutes § 46b-129 (g) provides: "At a contested hearing on the order for temporary custody or order to appear, credible hearsay evidence regarding statements of the child or youth made to a mandated reporter or to a parent may be offered by the parties and admitted by the court upon a finding that the statement is reliable and trustworthy and that admission of such statement is reasonably necessary. A signed statement executed by a mandated reporter under oath may be admitted by the court without the need for the mandated reporter to appear and testify unless called by a respondent or the child, provided the statement: (1) Was provided at the preliminary hearing and promptly upon request to any counsel appearing after the preliminary hearing; (2) reasonably describes the qualifications of the reporter and the nature of his contact with the child; and (3) contains only the direct observations of the reporter, and statements made to the reporter that would be admissible if the reporter were to testify to them in court and any opinions reasonably based thereupon. If a respondent or the child gives notice at the preliminary hearing that he intends to cross-examine the reporter, the person filing the petition shall make the reporter available for such examination at the contested hearing."

[4] The respondent father also claims on appeal that the court improperly failed to allow him to cross-examine the children's sister-in-law, who was called as a witness by the petitioner and was the current foster parent of the children, about whether she had ever provided the children with marijuana in the past or to make an offer of proof regarding the same. The petitioner's counsel had objected to this line of questioning on relevance grounds, arguing that placement of the children was an administrative decision by the department and that the witness' ability to care for the children was not an issue before the court at the contested hearing. The petitioner concedes on appeal that the court should have permitted the respondent father's counsel to make an offer of proof with respect to the relevance of the line of questioning. See *Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 150–51, 124 A.3d 501 (2015). Because, however, we reverse the court's judgments and remand the case for a new hearing on the basis of the other two evidentiary claims and are not convinced that the respondent father's third claim is likely to arise again on remand, we do not reach the merits of this claim.

[5] In arguing that the court improperly applied the hearsay exception in § 46b-129 (g), the respondent father does not challenge whether Zesmery was a mandated reporter as defined in General Statutes § 17a-101 (b) at the time the children made the statements to her that are the subject of this appeal.

[6] The respondent mother never appeared at either the preliminary hearing or the contested hearing and eventually was defaulted by the court.

[7] Zesmery testified at the contested hearing that Alizebeth had disclosed to her that, while the children were in Puerto Rico with their mother,

Alizabeth and Tanisha had been molested by one of the respondent mother's boyfriends and that Alizabeth had been forced to have sex with him. Zesmery also testified that Tanisha had disclosed to her that the respondent mother told Tanisha and Alyson that they needed to lose weight so the respondent mother could sell pictures of them online.

[8] The court also admitted statements that Alizabeth made during her forensic interview under the medical treatment exception to the hearsay rule; Conn. Code Evid. § 8-3 (5); the propriety of which we discuss in part II of this opinion.

[9] Section 8-9 of the Connecticut Code of Evidence provides: "A statement that is not admissible under any of the foregoing exceptions is admissible if the court determines that (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule."

[10] As we have explained herein; see footnote 2 of this opinion; at the time of the contested hearing, the three children were sixteen, fifteen, and thirteen years old.

[11] The respondent father's counsel also argued that the admission of the children's hearsay statements "would violate [the respondent father's] rights to confrontation and cross-examination under [General Statutes §] 46b-135, and it would be a denial of due process. . . . [T]he court would have to apply the [balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)] . . . [a]nd . . . the harm that could befall [him] greatly outweighs any advantage of shortcutting any of the rules of evidence." Because we reverse the underlying judgments on the basis of the court's improper evidentiary rulings, we do not address the constitutional arguments of the respondent father's counsel, to the extent that he has adequately raised and briefed them on appeal. See, e.g., *State* v. *Genotti*, 220 Conn. 796, 804, 601 A.2d 1013 (1992) (court should eschew reaching constitutional issues on appeal if claim may be disposed of on evidentiary grounds).

[12] General Statutes § 46b-129 (g) provides in relevant part: "*At a contested hearing on the order for temporary custody or order to appear*, credible hearsay evidence regarding statements of the child or youth made to a mandated reporter or to a parent may be offered by the parties and admitted by the court upon a finding that the statement is . . . reliable and trustworthy and that admission of such statement is reasonably necessary." (Emphasis added.)

[13] As explained in the commentary to § 8-6 of the Connecticut Code of Evidence, our code of evidence "contains no uniform definition of unavailability." The commentary further provides: "At common law, the definition of unavailability has varied with the particular hearsay exception at issue. . . . More recently, the court has adopted the federal rule's uniform definition of unavailability set forth in rule 804 (a) of the Federal Rules of Evidence." (Citations omitted.) Conn. Code Evid. § 8-6, commentary. Although the potential that a child might suffer psychological harm if required to testify in court was the basis for the assertion of unavailability considered and discussed by the court in *In re Tayler F.*, a court could deem a child unavailable for other reasons, such as the inability of the proponent to procure the witness at a hearing. See Fed. R. Evid. 804 (a); see also *In re Tayler F.*, supra, 296 Conn. 542–43.

[14] Practice Book § 32a-4 (b) provides: "Any party who intends to call a child or youth as a witness shall first file a motion seeking permission of the judicial authority."

[15] Connecticut Code of Evidence § 8-10, which sets forth the "tender years" exception to the hearsay rule applicable in criminal or juvenile proceedings, expressly limits its application to "a statement *by a child twelve years of age or younger* at the time of the statement relating to a sexual offense committed against that child, or an offense involving physical abuse committed against that child by the child's parent or guardian or any other person exercising comparable authority over the child at the time of the offense . . . ." (Emphasis added.)

[16] Snapchat is a widely used social media application that allows its users to share photographs, videos and messages that disappear from the recipient's device after a set period of time. See *Mahanoy Area School District* v. *B. L.*, U.S. , 141 S. Ct. 2038, 2043, 210 L. Ed. 2d 403 (2021); *State* v. *Njoku*, 202 Conn. App. 491, 501 n.10, 246 A.3d 33 (2021).

[17] The first photograph showed Alizabeth's texting Zesmery, "zesy im scared," to which Zesmery responded, "Dont be baby, its going to be okay.

We are going to protect you guys." The second photograph showed Alizabeth texting, "i want to leave i just don't know if I can say anything." Finally, the third photograph showed Tanisha texting, "Dad told me to tell dcf that is not true He's gonna know if I say something And he's gonna hate me." Zesmery responded: "He's not going to know if you tell DCF anything . . . they dont tell him what you guys say. Also, he is just trying to scare you guys into protecting your mom." Tanisha replies, "Yeah Ik and it's working."

The foregoing quoted material constitutes a verbatim recital of the Snapchat exchanges contained in exhibit B.

[18] In overruling the objection, the court did not indicate whether it was doing so on the basis of the statutory hearsay exception, the medical treatment exception, or both. We resolve that ambiguity by concluding that the court determined that the evidence was admissible under both exceptions offered, in the absence of any statement to the contrary and in light of the fact that the respondent father and the petitioner address the admission of the evidence on both grounds. We address the medical treatment exception in part II of this opinion.

[19] Section 1-1 (b) of the Connecticut Code of Evidence provides: "The Code [of Evidence] and the commentary apply to all proceedings in the Superior Court in which facts in dispute are found, except as otherwise provided by the Code, the General Statutes or any Practice Book rule adopted before June 18, 2014, the date on which the Supreme Court adopted the Code." Among the examples given in the commentary, is that "[t]he Code applies . . . to . . . juvenile proceedings . . . ." Conn. Code Evid. § 1-1 (b), commentary (b) (4).

Section 8-2 (a) of the Connecticut Code of Evidence provides: "Hearsay is inadmissible, except as provided in the Code, the General Statutes or any Practice Book rule adopted before June 18, 2014, the date on which the Supreme Court adopted the Code."

[20] Although the respondent father also claims on appeal that the court incorrectly determined that the children's statements had adequate indicia of reliability and trustworthiness, he does not claim that the court misconstrued the meaning of the term "reliable and trustworthy" as found in § 46b-129 (g). Nevertheless, we do not reach the respondent father's claim regarding the reliable and trustworthy prong in light of our conclusion that the trial court incorrectly determined that the admission of the hearsay statements was "reasonably necessary."

[21] We note that § 35a-23 of our rules of practice was adopted in response to *In re Taylor F.*, supra, 296 Conn. 524, and provides procedures that parties and the court must follow whenever a party "seeks the admission of a hearsay statement of a child pursuant to the residual exception to the hearsay rule based upon psychological unavailability . . . ." Practice Book § 35a-23 (a).

[22] General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

[23] As noted by our Supreme Court in its decision in *Pamela B.* v. *Ment*, supra, 244 Conn. 311 n.11, the Judicial Branch had commissioned an independent study that concluded that " '[t]he increase in emergency orders requested and the time to receive a ten-day emergency hearing has reached a critical point in Connecticut. State of Connecticut Court Improvement Project Report (Edmund S. Muskie Institute, University of Southern Maine, 1996) p. 38.' " The study found " 'widespread evidence that the [ten] day hearing requirement is an issue of great difficulty in the courts due to crowded court calendars.' " Id., p. 39. It found " 'a widespread practice of convening the initial [ten] day hearing within the statutory guidelines, introducing the parties into the record to formally initiate the hearing, and then continuing the hearing at a later date. The range of time for the completion of [ten] day hearings spanned from [ten] days to six months. This is a disturbing instance of compliance with the "letter" rather than the "spirit" of the law regarding temporary custody hearings.' " Id. The study recommended "that the state 'develop a strategy and devote resources to schedule and hear [ex parte orders of temporary custody] within a reasonable time of filing.' Id. at 66." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1998 Sess., p. 2188, written testimony of Paul Chill.

[24] We recognize that the second and third factors raise competing considerations. If the hearsay is particularly material to the custody determination, there is more reason to find its admission to be reasonably necessary. At

the same time, the more material the information, the greater the potential prejudice is to the respondent parent. The trial court must weigh these competing interests under the specific circumstances of the case before it. For example, a child's hearsay statement that a respondent parent physically assaulted the child would be very material to a custody determination but there may be little prejudice to the respondent parent from a lack of cross-examination if the statement is corroborated by other evidence, including physical evidence of an injury. By contrast, an uncorroborated statement that the respondent parent inappropriately touched the child may be unduly prejudicial without the opportunity to cross-examine the child.

[25] We caution that, in considering this factor, courts need not require proof of the degree of serious psychological harm that was required in *In re Tayler F.* It is equally important, however, to be mindful of the court's warning in *In re Tayler F.* that "[r]arely will it be in a child's best interest to testify"; *In re Tayler F.*, supra, 296 Conn. 547; and, therefore, courts must be equally cautious not to so loosely apply this factor such that proof of any possible discomfort that may accompany a child's in-court testimony renders the admission of the child's hearsay statements "reasonably necessary . . . ."

[26] The respondent father argues on appeal that, even if some or all of the challenged evidence pertaining to the claims of past physical and sexual abuse by the respondent mother properly was admitted and credited by the court, "there is still no proof that, at the time of the removal, the children were in immediate (as opposed to at some time in the past or hypothetically in the future) danger or that it was necessary (as opposed to preferable or even desirable) to remove them." (Emphasis omitted.) See *In re J.R.*, supra, 161 Conn. App. 573 ("finding of *immediate* physical danger is a prerequisite to the court's entry of a temporary order vesting custody of a child in one other than the child's parents" (emphasis added; internal quotation marks omitted)). The respondent father asks us to vacate the ex parte orders of temporary custody and order the children to be returned to his custody.

Although we acknowledge that vacating an ex parte order of temporary custody on concluding that insufficient evidence was presented at a contested hearing to sustain such an order is an appropriate appellate remedy, in evaluating a claim of evidentiary insufficiency, we consider the totality of the evidence that was before the trier of fact, including any evidence claimed to have been improperly admitted by the court. See, e.g., *State* v. *Chemlen*, 165 Conn. App. 791, 818, 140 A.3d 347 ("[A]ppellate review of the sufficiency of the evidence . . . properly includes hearsay evidence *even if such evidence was admitted despite a purportedly valid objection.* Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Emphasis added; internal quotation marks omitted.)), cert. denied, 322 Conn. 908, 140 A.3d 977 (2016).

Here, because there was evidence admitted at the contested hearing to support the court's findings that the allegations of physical abuse of the children by the respondent mother and of sexual abuse of the children by the respondent mother's boyfriends were serious, that the respondent father intended to have the respondent mother return to the family residence, and that the possibility of the respondent mother's presence or imminent return was not foreclosed by anything in the record, we agree with the petitioner that the respondent father cannot prevail on appeal on a theory of evidentiary insufficiency. The proper remedy in the present case is a new hearing.

———————————————